UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG H.,[1] <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, <br><br> Defendant. | Case No.: 22cv800-AJB(LR) <br><br> **REPORT AND RECOMMENDATION REGARDING JOINT MOTION FOR JUDICIAL REVIEW** <br><br> **[ECF No. 16]** |

This Report and Recommendation is submitted to the Honorable Anthony J. Battaglia, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California. On June 1, 2022, Plaintiff Craig H. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits. (Compl., ECF No. 1.)

Now pending before the Court is the parties' Joint Motion for Judicial Review.

---

[1] In the interest of privacy, this Report and Recommendation uses only the first name and initial of the last name of the non-government party or parties in this case. See S.D. Cal. Civ. R. 7.1(e)(6)(b).

(See J. Mot. Judicial Review, ECF No. 16 ("J. Mot.").)  For the reasons set forth below, the Court **RECOMMENDS** that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** for further administrative proceedings consistent with this Report and Recommendation.

## I.    PROCEDURAL BACKGROUND

On June 25, 2019, Plaintiff filed his first application for disability benefits, alleging disability beginning on January 1, 2019.  (Certified Admin. R. 162, ECF No. 12 ("AR").) After his application was denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Id. at 101-02.)  On February 6, 2021, a hearing was held before ALJ Randolph Schum, during which Plaintiff was represented by counsel.  (Id. at 39-56.)  A vocational expert ("VE") was also present at the hearing.  (See id.)  On March 30, 2021, the ALJ found that Plaintiff was not disabled between the alleged disability onset date of January 1, 2019, and the date of the ALJ's decision.  (See id. at 34.)  On May 30, 2021, Plaintiff requested that the Appeals Council Review the ALJ's decision.  (See id. at 157-58.)

On April 7, 2022, the Appeals Council denied Plaintiff's request to review the ALJ's decision.  (See id. at 1-3.)  Plaintiff filed the instant civil action on June 1, 2022. (See Compl., ECF No. 1.)

## II.    THE SEQUENTIAL DISABILITY PROCESS

The initial burden of proof rests upon the claimant to establish disability.  See Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986).  To meet his burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step process for determining whether a person is disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.  At the first step of the five-step sequential evaluation process, the ALJ must determine if a claimant is engaged in "substantial gainful activity;" if so, the

claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At the second

step, the ALJ must determine whether the claimant has a "severe medically determinable

physical or mental impairment" or combination of impairments that has lasted or is

expected to last for a continuous period of at least 12 months; if not, the claimant is not

disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); see also 20 C.F.R.

§§ 404.1509, 416.909.  At the third step, the ALJ must determine if the claimant's

impairment(s) meets or equals that of a listed impairment; if so, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At the fourth step, the ALJ must

determine whether, based on the claimant's residual functional capacity ("RFC"), the

claimant can perform his or her past relevant work; if so, the claimant is not disabled.  20

C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At the fifth step, the ALJ must

determine whether, based on the claimant's residual functional capacity, age, education,

and work experience, the claimant can make an adjustment to other work; if so, the

claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    SUMMARY OF THE ALJ'S FINDINGS

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

activity since January 1, 2019, the alleged onset date of his disability.  (See AR at 17.)  At

step two, the ALJ found that Plaintiff had the following severe impairments: arthrosis of

the right wrist and post right thumb surgery; osteoarthritis of the right foot and

hammertoe; and history of human immunodeficiency virus (HIV).  (See id. at 17.)  In

making this finding, the ALJ determined that "[Plaintiff's] medically determinable

mental impairments of anxiety, depression, and neurodevelopmental disorder, considered

singly and in combination, did not cause more than minimal limitation in [Plaintiff's]

ability to perform basic mental work activities and were, therefore, non-severe."  (Id. at

21.)  At step three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the

impairments listed in the Commissioner's Listing of Impairments.  (See id. at 24.)  Next,

the ALJ determined that Plaintiff has the residual functional capacity to:

perform light work as defined in 20 CFR 404.1567(b) except that he should never climb ropes, ladders or scaffolds; could frequently balance; could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; could frequently handle and finger with the right upper extremity; could occasionally perform forceful grasping or torquing motions on the right; and, should avoid concentrated exposure to extreme cold, unprotected heights, and moving and dangerous machinery.

(Id. at 24-25.)

At step four, the ALJ adduced and accepted the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC would be able to perform his past relevant work.  (See id. at 33.)  Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of Plaintiff's past relevant work, the ALJ found that Plaintiff was not disabled.  (See id. at 33-34.)

In determining that Plaintiff was not disabled, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record."  (Id. at 26.)  In reaching this finding, the ALJ found the opinion of Matthew Messoline, M.D., "unpersuasive," and as a practical matter rejected Dr. Messoline's opinion.  (See id. at 32.)  Additionally, the ALJ rejected a number of Plaintiff's statements about his symptoms and limitations during the hearing.  (See id. at 24-33.)

## IV.   DISPUTED ISSUES

As reflected in the parties' Joint Motion for Judicial Review, Plaintiff raises the following issues as the grounds for reversal:

1.   Whether the ALJ's step four finding was supported by substantial evidence. (J. Mot. at 6:10 ("[T]he ALJ's step four finding is not supported by substantial evidence.").)

2.   Whether the ALJ properly evaluated Plaintiff's mental impairments in his

RFC assessment at step two.  (Id. at 10:21-23 ("Here, the ALJ concluded that [Plaintiff's] mental impairments were nonsevere at step two . . . However, the record contains evidence that [Plaintiff's] mental impairments would interfere with his ability to perform basic work activities."); id. at 15:20-21 ("The ALJ's finding that Plaintiff did not have a severe mental impairment was proper and supported by substantial evidence.").)

3.     Whether the RFC adequately accounts for Plaintiff's physical impairments. (Id. at 23:4-5 ("[T]he RFC does not contain adequate limitations to account for [Plaintiff's] hand, foot, and back impairments."); id. at 26:22-25 ("The ALJ explained that the weight of the evidence—specifically, the medical evidence, Plaintiff's demonstrated capabilities, and the opinion evidence—best comported with the restricted range of work delineated in Plaintiff's RFC.").)

## V.     STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012), superseded by regulation on other grounds.

The Court must affirm the Commissioner's decision if it is "supported by substantial evidence and based on the application of correct legal standards."  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (per curiam).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  Substantial evidence means "more than a mere scintilla but less than a preponderance."  Id.  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "weigh both the evidence that supports and the evidence that detracts from the ALJ's factual conclusions."  Gutierrez v. Comm'r Soc. Sec., 740 F.3d 519, 523 (9th Cir. 2014) (internal quotation omitted).  When evidence is "susceptible to more than one rational interpretation, one of which supports the ALJ's decision," the Court must

uphold the ALJ's conclusion.  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

The Court may consider "only the reasons provided by the ALJ in the disability

determination and may not affirm the ALJ on a ground upon which [he or she] did not

rely."  Revels v. Berryhill, 874. F.3d 648, 654 (9th Cir. 2017) (internal quotation

omitted).

Error in a social security determination is subject to a harmless-error analysis.

Ludwig v. Astrue, 681 F.3d 1047, 1054 (9th Cir. 2012).  "[A]n error is harmless so long

as there remains substantial evidence supporting the ALJ's decision and the error does

not negate the ALJ's ultimate conclusion."  Molina, 674 F.3d at 1115 (internal quotation

omitted).  The Court must "look at the record as a whole to determine whether the error

alters the outcome of the case."  Id.  An error that is "inconsequential to the ultimate

nondisability determination" is harmless.  Id. (internal quotation omitted).

## VI.   DISCUSSION

Although the parties present the ALJ's step four determination as the first issue in

their Joint Motion, the evaluation of Plaintiff's mental impairments at step two and

Plaintiff's physical impairments in formulating his RFC were discussed first in the ALJ's

written decision.  Accordingly, the Court addresses the ALJ's discussion of Plaintiff's

impairments before turning to the parties' arguments concerning the step four

determination.  Specifically, because the ALJ committed legal error at steps two and four,

the Court **RECOMMENDS** that the case be remanded to the Social Security

Administration for further development of the record.

**A.     The ALJ's Evaluation of Plaintiff's Mental Impairments at Step Two**

**1.     Hearing testimony and the ALJ's decision**

During the hearing, the ALJ asked Plaintiff's counsel whether any additional

records still needed to be received into evidence:

> ALJ: Are we still waiting for (INAUDIBLE) of the medical
> records?
>
> [Plaintiff's Attorney]: We are still waiting on Neighborhood

Health, I believe, Your Honor.

ALJ: Just Neighborhood Health?

[Plaintiff's Attorney]: I believe so.

ALJ: Okay.  I'm going to give you 30 days to get those in from Neighborhood Health.  If they're not in within 30 days it will be incumbent upon you to request more time in writing.

(AR at 43.)  Later in the hearing, Plaintiff explained that the Neighborhood Health records related to his psychiatric treatment:

[ALJ]: Are you getting any treatment for a psychologist or psychiatrist?

[Plaintiff]: Yes, I'm in, I have a therapist here at Neighborhood Health.  And I also see a psychiatrist, who I'm taking medication and stuff with for the anxiety and that now.
. . .

[ALJ]: And what's the psychiatrist's name?

[Plaintiff]: Dr. Caplin (PHONETIC).  He's at the mental health, north property—

[ALJ]: Of Neighborhood Health?

[Plaintiff]: Yeah, it's on Morena Boulevard.

(Id. at 49-50.)

It does not appear that any of Plaintiff's psychiatric records were ever entered into the record.  A January 9, 2020, "Request for Corrective Action" by the Agency's La Jolla field office noted that Plaintiff's therapy records were not included in his file, leaving insufficient evidence to determine how severe his impairments were:

In addition, the claimant did not allege a mental impairment. However, the evidence reveals a diagnosis of an adjustment disorder.  The claimant presented to Sharp Rees-Stealy Medical

7

Group on 01/10/19 with anxiety.  A return visit dated 01/22/19 reveals a diagnosis of an adjustment disorder.  In June 2019, the claimant reported doing well and mood was good.  The claimant reported he was going to therapy and AA meetings.

Based on the evidence, the DDS proposed a light range Residual Functional Capacity (RFC) assessment with postural and manipulative limitations.  In addition, a non-severe Psychiatric Review Technique Functional (PRTF) assessment was completed.  The claim was denied.

The claimant completed a request for a reconsideration on 10/11/19.  The claimant reported on the SSA-3441 symptoms of swelling and stiffness of his feet, discomfort when walking, pain in toes, constant back pain, mood swings, paranoia, difficulty sleeping, loss of interests, poor time management, and trouble multi-tasking.  The claimant did not report any additional treatment.  The prior assessments were affirmed.  The claim was denied.  However, the evidence is insufficient to address worsening of symptoms reported on the SSA-3441.  In addition, the claimant reported attending therapy but those records were not in file.  Therefore, the evidence is insufficient to determine impairment severity of the claimant's allegations.

(Id. at 218.)  Additionally, a request for patient information from Neighborhood Healthcare Center appears to have been returned to the Agency without the requested information enclosed with a handwritten note that states "Not Our Pt" on November 6, 2019.  (See id. at 421-24.)

The ALJ's written decision found that Plaintiff's medically determinable impairments of anxiety, depression, and neurodevelopmental disorder "considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were, therefore, non-severe."  (Id. at 21.)  Notwithstanding this finding, the ALJ was required by the regulations to consider the limiting effects of all of Plaintiffs impairments—even the ones that are not severe—in determining Plaintiff's RFC.  See 20 C.F.R. § 404.1545(e); see also SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and

restrictions imposed by all of the individual's impairments, even those that are not 'severe.'").

At step two of the five-step disability evaluation, the ALJ considered the four broad functional areas of mental functioning set forth in the regulations for evaluating mental disorders. These four functional areas include (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentration, persistence, or maintaining pace; and (4) adapting or managing oneself. See 20 C.F.R. § 404.1520a(c)(3) (listing these "four broad functional areas in which [the Agency] will rate the degree of [a claimant's] functional limitation" when evaluating mental impairments). These four functional areas are also known as the "paragraph B criteria" due to how they are categorized in the listings. See 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that Plaintiff had no limitations in the first area of mental functioning and only mild limitations in the other three areas.

First, the ALJ found that Plaintiff had no limitation in the area of understanding, remembering, or applying information. (See AR at 21.) In support of this finding, the ALJ noted that findings from a Department of Social Services psychiatric consultative examination by Gregory Nicholson, M.D. included that Plaintiff's mood was depressed, affect was tearful and dysphoric, thought process was coherent and organized, there was no bizarre or psychotic thought content, Plaintiff denied any plan for self-harm or any plan to harm others, denied recent auditory or visual hallucinations, and he did not appear to be responding to internal stimuli during the interview. (AR at 21 (citing AR at 426-432).) The ALJ referenced Dr. Nicholson's finding that Plaintiff had no limitations in the ability to understand, remember, and carry out simple one or two-step job instructions, or in the ability to perform detailed and complex instructions. (See id. (citing AR at 431).) The ALJ then went on to cite to the state agency psychological consultant—Kevin Donovan, Ph.D.—who also concluded that Plaintiff did not have any limitations in this category. These findings were based on a phone call with Plaintiff during which Dr.

Donovan determined that Plaintiff did not have any difficulty with memory or concentration and "was able to follow the conversation." (See id. (citing AR at 80-81).)

Second, the ALJ found that Plaintiff had a mild limitation in interacting with others. (See id.) The ALJ also based these findings on the mental status examination by Dr. Nicholson, noting (among other details) that Plaintiff made good eye contact and good interpersonal contact with the interviewer, he was generally cooperative, was able to volunteer information spontaneously, there was no psychomotor agitation or retardation, he appeared to be genuine and truthful, and that his speech was normally and clearly articulated. (See id. (citing AR at 429-30).) Dr. Nicholson then assessed that Plaintiff's ability to relate and interact with coworkers and the public was mildly limited, which the ALJ incorporated by reference. (See id. (citing AR at 431-32).) The ALJ again cited to the state agency psychological consultant—Dr. Donovan—who concluded from his conversation with Plaintiff and a review of Dr. Nicholson's evaluation that Plaintiff had a mild limitation in this area. (See id. at 21-22 (citing AR at 81).)

Third, the ALJ again found that Plaintiff had a mild limitation in concentrating, persisting, or maintaining pace. The ALJ once again cited to Dr. Nicholson's evaluation of Plaintiff, noting that Plaintiff was alert and oriented to time, place, person and purpose, appeared to be of average intelligence, was able to recall three words immediately and zero words after five minutes and two words with hints, and was able to perform basic spelling and calculations. (See id. at 22 (citing AR 429-31).) The ALJ noted that Dr. Nicholson assessed a mild limitation in the ability to maintain concentration and attention, persistence, and pace. (See id. (citing AR at 432).) The ALJ again cited to Dr. Donovan's opinion, which opined from a review of Dr. Nicholson's notes and a phone call with Plaintiff that he had a mild limitation in this functional area. (See id. (citing AR at 81).)

Finally, the ALJ found that Plaintiff had a mild limitation in the functional area of adapting or managing oneself. (See id.) This section of the ALJ's findings included a discussion of Plaintiff's reported daily activities. Citing to the same examinations by Dr.

Nicholson and Dr. Donovan, the ALJ noted that Plaintiff lived alone, did not cook meals, ordered food from a delivery service, had someone else help him with his laundry, was able to operate a vehicle for transportation, and did not have any issues with dressing, bathing, or hygiene.  (See id. (citing AR at 429, 81).)  The ALJ also noted that Dr. Nicholson assessed mild limitations in maintaining regular attendance in the workplace, performing work activities on a consistent basis, and performing work activities without special or additional supervision.  (See id. (citing AR at 429).)  In addition to citing to the two examinations discussed in the other categories above, the ALJ cited to Plaintiff's Adult Function Report, which described some of Plaintiff's daily activities.  The ALJ noted that Plaintiff lived alone in an apartment and could perform the following activities in a day: catch up on email, have coffee, shower, head to work, plan parties for clients, come home, make dinner, work on email, and then go to bed.  (See id. (citing AR at 209-15).)  Plaintiff noted in this function report that he had difficulty buttoning shirts and lifting arms overhead when bathing, he could prepare his own meals, asked people to carry his laundry for him, he walked, drove a car, could go out alone, shopped in stores, and that his hobby was gardening.  (See id.)

Following his individualized assessment of each of the four broad areas of mental functioning, the ALJ noted that "[t]here is medical evidence supporting" the assessment summarized above.  (See id.)  Citing a December 2019 infectious disease progress report written by Joshua Minuto, M.D., the ALJ noted that Plaintiff had "some" depression the week before the report was written and was seeing a therapist but otherwise was "doing well."  (See id. (citing AR at 574).)  Additionally, the ALJ noted that although the claimant was placed on a 5150 psychiatric hold "for psychosis with methamphetamine abuse" between July 2 and 4, 2020, Plaintiff reported that he had "not been on mental health medications in 'several years.'"  (Id. (quoting AR 444-46; 454).)  Further, without citation, the ALJ noted that Plaintiff's "medical records did not appear to contain any treatment notes [from] a mental health provider."  (Id.)

After making the findings regarding Plaintiff's mental limitations in all four of the broad functional paragraph B areas, the ALJ specifically acknowledged that:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Id. at 23.) The ALJ then goes on to include largely the same analysis as can be found in his discussion of the paragraph B factors noted above—only this time it is included in the context of whether the medical opinions are persuasive:

> As for opinion evidence, the undersigned founds [sic] the opinion of psychiatrist and consultative examiner Dr. Nicholson to be persuasive [AR at 427-32]. The examiner performed a mental status examination of the claimant, discussed above, and opined that he had mild limitation in the following abilities: relate and interact with coworkers and the public; maintain concentration and attention, persistence and pace; accept instructions from supervisors; maintain regular attendance in the work place and perform work activities on a consistent basis; and, perform work activities without special or additional supervision [AR at 432]. The examiner opined that the claimant had no limitation in the following abilities: understand, remember, and carry out simple one or two-step job instructions; and, perform detailed and complex instructions [Id. at 431]. This opinion is persuasive because it is supported by the objective medical evidence, which revealed a lack of mental health treatment, discussed above. This opinion is persuasive because it is consistent with Dr. Nicholson's mental status examination findings of: depressed mood, tearful and dysphoric affect; coherent and organized thought process; no abnormality of thought content; neat and casual grooming; good eye contact; cooperative behavior; normal speech; able to recall three words immediately and zero words after five minutes and two words with hints; digit span was six forward and three backward; able to spell "world" both

forward and backward; able to perform serial threes; intact fund of knowledge; and, intact insight and judgment, discussed above. Therefore, the undersigned finds this opinion to be persuasive.

The undersigned finds the February 2020 opinion of state agency psychological consultant Dr. Donovan to be persuasive [Id. at 70-87]. The consultant opined that the claimant had the following limitation in the paragraph B criteria: no limitation in the ability to understand, remember, or apply information; and mild limitation in the abilities to interact with others, in concentration, persistence, and maintaining pace, and in adapting or managing oneself [AR at 80-81]. This opinion was persuasive because it is supported by the objective medical evidence, which the consultant had the opportunity to review, such as Dr. Nicholson's mental status examination, discussed above. This opinion is persuasive because it is consistent with Dr. Nicholson's mental status examination findings of: depressed mood, tearful and dysphoric affect; coherent and organized thought process; no abnormality of thought content; neat and casual grooming; good eye contact; cooperative behavior; normal speech; able to recall three words immediately and zero words after five minutes and two words with hints; digit span was six forward and three backward; able to spell "world" both forward and backward; able to perform serial threes; intact fund of knowledge; and, intact insight and judgment, discussed above. Therefore, the undersigned finds this opinion to be persuasive.

The undersigned finds the 2019 opinions of the state agency psychological consultants, Dr. Donovan and Jane Buerger, Ph.D., to be unpersuasive [Id. at 57-66; 70-87]. The consultants opined that the claimant had no limitation in all of the paragraph B criteria [AR at 61-62; 79-80]. These opinions were unpersuasive because they were not supported by and were inconsistent with Dr. Nicholson's mental status exam findings, which the consultants did not have the opportunity to review at that time. Therefore, the undersigned found these opinions to be unpersuasive.

(AR at 23-24.)

13

## 2.     Parties' Arguments

Plaintiff presents three challenges to the ALJ's discussion of his mental impairments.  First, Plaintiff argues that the ALJ erred in finding his medically determinable mental impairments non-severe.  (See J. Mot. at 10:21-23.)  Pointing to the incident in the record where he was held on a 5150 hold for driving on the wrong side of the road, as well as additional findings from Dr. Nicholson's examination, Plaintiff argues that his level of paranoia, ability to understand, carry out, and remember instructions affect his ability to function in a routine work setting.  (See id. at 21:23-26; 11:5-8.)

Second, Plaintiff argues that the ALJ erred by failing to include any mental health limitations in his RFC.  (See id. at 14:1-3.)  Citing SSR 96-8p, Plaintiff contends that the ALJ was required to consider the limiting effects of his impairments—even the ones that are non-severe—in formulating Plaintiff's RFC.  (See id. at 12:11-13.)  Although the ALJ assessed Plaintiff's mental limitations under the paragraph B criteria, Plaintiff contends that the ALJ failed to make a "more detailed assessment" of Plaintiff's mental functions in formulating his RFC, which ultimately contained no analysis of any of the mental limitations assessed in the step two analysis.  (See id. at 13:6-13.)  The ALJ's failure to explain why, after finding that Plaintiff had mild mental limitations in some of the four paragraph B criteria, he did not include any restrictions related to those limitations in Plaintiff's final RFC assessment, amounts to reversible error under Plaintiff's arguments. (See id. at 12 n.6; 13:6-13.)

Finally, Plaintiff argues that the ALJ erred by failing to fully and fairly develop the record to include additional mental health treatment records that were brought to the ALJ's attention during the hearing and throughout the record.  (See id. at 15:13-15.)  Specifically, Plaintiff argues that there are multiple notes throughout the record of him seeing psychiatric professionals and taking anxiety medication, but that the ALJ failed to inquire about any records from his therapists.  (See id. at 15.)  Especially since he had been placed in a 5150 hold for psychiatric problems, Plaintiff argues that reversal and

1  remand are warranted so that his RFC can be reformulated based on the totality of his

2  relevant mental health records.  (See id.)

3          In response, Defendant argues that the ALJ properly found Plaintiff's mental

4  limitations non-severe.  (See id. at 16:1-4.)  Citing Dr. Nicholson and Dr. Donovan's

5  findings, Defendant contends that the ALJ's findings of mild mental limitations were

6  justified by substantial evidence because they were based on their own independent

7  examinations of Plaintiff and his medical records.  (See id.)  Defendant further contends

8  that the record did not evidence any "regular or ongoing mental-health treatment,"

9  demonstrating that the ALJ properly found that Plaintiff's treatment history did not

10  support severe mental impairments.  (Id. at 17.)  Additionally, Defendant argues that the

11  ALJ's discussion of Plaintiff's daily activities properly concluded that "Plaintiff's

12  demonstrated capabilities were consistent with intact mental functioning," and that the

13  ALJ properly concluded that the July 2020, 5150 hold incident was a result of Plaintiff's

14  illicit drug use, rather than "psychosis or paranoia."  (Id. at 17-18.)

15          Next, in response to Plaintiff's arguments about the ALJ's RFC formulation,

16  Defendant contends that Ninth Circuit precedent does not require the ALJ to include a

17  discussion of Plaintiff's mental limitations in his ultimate RFC determination.  (See id. at

18  19.)  Citing to Woods v. Kijakazi, 32 F.4th 785 (9th Cir. 2022) as well as other Ninth

19  Circuit cases, Defendant argues that an ALJ does not need to include any mental

20  limitations in a claimant's RFC. (See id.)

21          Finally, in addressing Plaintiff's argument that the ALJ failed to properly develop

22  the record with respect to his mental health records, Defendant contends that the Agency

23  discharged this duty by subpoenaing all the doctors, healthcare professionals, hospitals

24  and clinics that Plaintiff identified as having provided him treatment, had two psychiatric

25  consultants review Plaintiff's medical records and opine as to his mental RFC, obtained a

26  comprehensive consultative examination by Dr. Nicholson, and held a merits hearing.

27  (See id. at 20.)  After contending that the ALJ would have only been under a duty to

28  develop the record if there was a "conflict or ambiguity," Defendant argues that the ALJ

identified substantial evidence in the record that supported his decision.  (See id.)
Additionally, Defendant argues that Plaintiff waived his argument that the ALJ had a duty
to further develop the record.  (See id.)  Noting that the ALJ asked Plaintiff's counsel
whether more time was needed to add Neighborhood Health records into evidence and
left the record open for thirty additional days, Plaintiff failed to add any additional
records or ask for more time.  (See id. at 20-21.)  Regardless of this waiver, however,
Defendant notes "Plaintiff testified that he did not begin seeing a therapist until October
of 2020, almost two years after his January 1, 2019 alleged onset date."  (See id. at 21.)
Accordingly, Defendant argues that even if the ALJ were to consider any records
evidencing therapy, they would not change the ALJ's ultimate determination of a non-
severe mental impairment.  (See id.)  Accordingly, Defendant argues that the ALJ's
decision should be affirmed.

### 3. Duty to develop the record

#### a. Applicable law

Although a claimant is ultimately responsible for providing sufficient medical
evidence of a disabling impairment, "the ALJ has a special duty to develop the record
fully and fairly and ensure that the claimant's interests are considered, even when the
claimant is represented by counsel."  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir.
2001).  This responsibility "rests with the ALJ in part because disability hearings are
inquisitorial rather than adversarial in nature."  Loeks v. Astrue, Civil No. 09–1435–HA,
2011 WL 198146, at *5 (D. Or. Jan. 18, 2011) (citing Sims v. Apfel, 530 U.S. 103, 110-
11 (2000)).  "It is the ALJ's duty to investigate the facts and develop the arguments both
for and against granting benefits."  Sims, 530 U.S. at 111.

The ALJ's duty to develop the record is triggered when the evidence is ambiguous
or when the record is inadequate for a proper evaluation of the claimant's limitations.
See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  The evidence is
"insufficient when it does not contain all the information [the Agency] need[s] to make
[its] determination or decision."  20 C.F.R. § 416.920b.  "The ALJ may discharge this

duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Tonapetyan, 242 F.3d at 1150.

### b.    Analysis

As an initial matter, the Court concludes that Plaintiff did not waive his argument regarding the ALJ's duty to develop the record.  As discussed above, Defendant notes that the ALJ explicitly advised Plaintiff's counsel during the hearing that he was leaving he record open for thirty days to provide Plaintiff with the opportunity to submit additional records related to his mental health, and that Plaintiff could request additional time to do so if he could not obtain the pertinent records within thirty days.  (See J. Mot. at 20.)  Defendant contends that by failing to submit "any additional records or request additional time, Plaintiff extinguished his current argument that the record was incomplete."  (Id. at 21.)  Ordinarily, Defendant's argument would be correct—leaving the record open for a period after the hearing to allow a claimant to submit additional records can be sufficient to discharge the ALJ's duty to develop the record.  See, e.g., Arney v. Kijakazi, No. 2:21-cv-01633-VCF, 2022 WL 3714999, at *4 (D. Nev. Aug. 29, 2022) (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)) (concluding that the ALJ satisfied his duty to develop the record by leaving the record open after the hearing and finding that the evidence submitted by the plaintiff's counsel was insufficient to establish disability).

Here, however, there was a much more obvious gap in the record that should have alerted the ALJ to the fact that Plaintiff's mental health treatment records were missing. Other district courts within the Ninth Circuit have found an erroneous failure to develop the record under similar circumstances, even if the claimant is represented by counsel who states that the record does not need to be supplemented further.  See, e.g., Matthews v. Berryhill, Case No. SA CV 16–2226–DFM, 2018 WL 1352927, at *2-3 (C.D. Cal. Mar. 15, 2018) (collecting cases and noting that an ALJ had a duty to fully and fairly develop the record when a critical report was obviously missing from the claimant's

treatment records).  Plaintiff stated during the hearing that he was seeing a psychiatrist and a therapist at "Neighborhood Health" for his psychological symptoms, and Plaintiff's counsel expressly noted during the hearing that the record was still missing treatment notes from that facility.  (AR at 49; 43.)  Under these circumstances the ALJ had an independent duty to assure that Plaintiff's interests were considered, and the Court concludes that this argument is not waived simply because Plaintiff's counsel did not submit additional records after the ALJ left the record open for an additional thirty days.  See, e.g., Spaulding v. Comm'r Soc. Sec. Admin., No. CV-19-05747-PHX-DMF, 2021 WL 321233, at *4 (D. Ariz. Feb. 1, 2021) (concluding that leaving the record open was insufficient to fulfill the ALJ's duty to develop the record when the medical opinions that that were included did not provide an adequate assessment regarding the claimant's functional limitations during the relevant period).

Additionally, Defendant's argument that the Agency "appropriately developed the record" by "subpoenaing all of the doctors, healthcare professionals, hospitals, and clinics that Plaintiff identified as having provided (or planned to provide) treatment," falls short.  Although the record reflects that one subpoena requesting Plaintiff's patient records from "Neighborhood Healthcare Center" was returned uncompleted during the Agency's initial review of Plaintiff's application (AR at 421-22), no other subpoenas or requests for medical records from the Agency are reflected in the record, and there is nothing to suggest that the ALJ attempted to obtain these records and was unable to do so.  The "Request for Corrective Action" by the Agency underscores this deficiency by noting that Plaintiff returned to a medical visit at Sharp Rees-Stealy Medical Group in January of 2019 with a diagnosis of an adjustment disorder.  (See AR at 218.)  This corrective action request also notes that Plaintiff reported attending therapy, but that these records were not in his file, concluding that "[a]dditional information from the claimant, third parties, or treating sources may also be helpful."  (Id. at 218-19.)  In other words, there is not enough evidence for the Court to conclude that the ALJ even attempted to satisfy his

independent duty to fairly develop the record by seeking out Plaintiff's mental health treatment records.

This gap in the record is especially apparent when viewed in the context of the evidence cited by the ALJ's written opinion in finding Plaintiff's mental impairments non-severe.  Despite multiple instances in the record that reference Plaintiff's mental health treatments as far back as 2019 (see, e.g., AR at 590, 200, 217-18, 235) both Defendant and the ALJ repeatedly use the lack of treatment notes from a mental health provider in the record as justification for the finding that Plaintiff had non-severe mental impairments.  (See, e.g., id. at 22 ("the claimant's medical records did not appear to contain any treatment notes [from] a mental health provider"); J. Mot. at 6-8 ("Because the record contained scant evidence of mental-status examinations, the agency obtained a psychiatric consultative examination from Gregory M. Nicholson, M.D."); id. at 18 ("[Plaintiff's] medical records did not evidence any additional episodes of psychosis or paranoia.").)  Although the Agency arranged for a consultative medical examination in the form of Dr. Nicholson's opinion to supplement the lack of documented mental health treatment in the record, the ALJ's own citation to a known gap in Plaintiff's medical records undercuts Defendant's argument that the record was sufficiently complete to allow for a proper evaluation of the evidence pertaining to Plaintiff's mental impairments.  See Dale M. v. Kijakazi, Case No. 3:21-cv-1484-SI, 2023 WL 1815530, at *8 (D. Or. Feb. 8, 2023) ("[a]lthough the Commissioner argues that the ALJ found neither ambiguity nor inadequacy in the record, the ALJ's failure to examine all the evidence available to him undercuts his evaluation of the record as complete").  Where the ALJ fails to develop the record by evaluating evidence that is presumably available to him, the Court cannot conclude that the ALJ's decision was based on substantial evidence.  See Michael K. v. Saul, No. 1:18-cv-03165-MKD, 2019 WL 7819554, at *8 (E.D. Wash. July 31, 2019) (citing Mayes, 275 F.3d at 459-60) ("the inadequate record triggered the ALJ's duty to conduct an appropriate inquiry and develop the record further.").  Given that the record is completely devoid of any records relating to

Plaintiff's mental health treatment—which the ALJ knew about at the time of the hearing—the Court concludes that the ALJ did not satisfy his duty develop the record. This alone necessitates remand for further administrative proceedings to correct this deficiency.

### 4.   Whether the ALJ's opinion was supported by substantial evidence

Although the ALJ did not properly develop the record such that an accurate determination can be made as to whether his opinion was justified by substantial evidence, the Court finds it helpful to point out several instances in which the failure to develop the record led to the mischaracterization of record evidence. First, with respect to managing oneself, the ALJ noted that at a December 2019 infectious disease consultation, Joshua Minuto, M.D., described "some" depression the week prior, but that he saw his therapist the day before and was "doing well." (AR at 22 (citing id. at 574).) This incident was used in support of the ALJ's finding that Plaintiff had only a mild limitation in managing himself, but this description does not even scratch the surface of Plaintiff's reported treatment history, let alone the symptoms that his treatment notes from other doctors explained. For instance, another treatment note signed by Matthew Messoline, M.D., notes that Plaintiff had been "seeing [a] therapist for the past few months, they suggested possible medication." (Id. at 590.) This same treatment note explains that Plaintiff had been diagnosed with an adjustment disorder, but the ALJ's opinion makes no mention of this diagnosis or whether it affected Plaintiff's mental capacity. (Id. at 591.) Additionally, a hearing office form entitled "Claimant's Medications" notes that Plaintiff was prescribed Risperidone for his anxiety, but the ALJ's opinion makes no mention of this medication or whether it was effective in managing Plaintiff's symptoms. (Id. at 235.) In short, the record evidenced the possibility of a much more extensive treatment history than the ALJ characterized in his written opinion—one which the ALJ did not sufficiently address.

Second, with respect to Plaintiff's 5150 hold between July 2 and 4 of 2020, the ALJ characterized the incident as a "psychiatric hold for psychosis with

methamphetamine abuse," during which Plaintiff reported he had not been on mental health medications for "several years."  (Id. at 22 (citing id. at 446).)  Consultation notes from that same incident, however, explain that Plaintiff had been prescribed anti-anxiety medication that he was taking twice a day.  (See id. at 454.)  Additionally, Plaintiff reported during the hearing that he was taking medication for his anxiety, but the ALJ did not make any effort to clarify when he started taking this medication, or which provider prescribed it to him.  (See id. at 49.)  Defendant argues that even if the Court were to consider "any records evidencing therapy, Plaintiff's failure to obtain significant mental-health treatment for nearly two years of the alleged disability period would still undermine the existence of a severe mental impairment."  (J. Mot. at 21:6-9.)  The existence of some treatment, including Plaintiff's prescription for anti-anxiety medication and continual references to therapy and psychiatrist appointments throughout the record, however, make it impossible for the Court to determine whether the ALJ's statements about Plaintiff's course of treatment are correct, and amount to unfair consideration of the limited evidence in the record by the ALJ.  See Henderson v. Saul, No. 2:19-CV-00028-NJK, 2020 WL 774360, at *4 (D. Nev. Feb. 18, 2020) ("An ALJ must review the record as a whole and is not permitted to mischaracterize that record by 'cherry-picking' aspects in an effort to support a finding of non-disability.").  This deficiency also warrants remand for further clarification.

### 5.    Paragraph B criteria and the ALJ's RFC formulation

Plaintiff next challenges the ALJ's ultimate RFC formulation in step four of the sequential disability process for failing to include any discussion of his mental health limitations.  See Section VI.A.2, supra.  Although the ALJ assessed Plaintiff's mental limitations under the paragraph B criteria, Plaintiff contends that the ALJ failed to make a "more detailed assessment" of his mental functions in formulating his RFC, which ultimately contained no discussion of any of the mental limitations assessed in the step two analysis.  (See id. at 13:6-13.)

### a.      Applicable law

An RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "RFC is what an individual can still do despite his or her limitations. Id. In determining a claimant's RFC, the ALJ must consider "all of the relevant medical and other evidence." 20 C.F.R. § 416.945(a)(3). If a claimant has more than one impairment, the ALJ must consider the limiting effects of all impairments, including "medically determinable impairments that are not 'severe.'" 20 C.F.R. § 416.945(a)(2). "The RFC therefore should be exactly the same regardless of whether certain impairments are considered 'severe' or not." Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017) (emphasis omitted). Thus, a claimant generally cannot be prejudiced by the ALJ's failure to consider a particular impairment as severe at step two, as long as the ALJ finds that the claimant has at least one severe impairment, and still addresses the non-severe impairment when considering the claimant's RFC. See id.

As noted above, at step two of the five-step disability evaluation, the ALJ must consider the four broad functional areas of mental functioning set forth in the regulations for evaluating mental disorders. These four functional areas include: (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentration, persistence, or maintaining pace; and (4) adapting or managing oneself. See 20 C.F.R. § 404.1520a(c)(3) (listing the "four broad functional areas in which [the Agency] will rate the degree of [a claimant's] functional limitation" in evaluating mental impairments). These four functional areas are known as the "paragraph B criteria" due to how they are categorized in the listings. See 20 C.F.R. Part 404, Subpart P, Appendix 1.

An ALJ's assessment of a claimant's limitations under the paragraph B criteria, however, is not the same as an RFC determination, which requires "a more detailed assessment:"

> While similar evidence may be used in both assessments of Plaintiff's mental impairments, they are distinct, and limitations

assessed in the context of the paragraph B assessment are not necessarily transferrable to the more detailed assessment required when formulating the RFC. The ALJ's task when assessing the RFC is not to provide an adequate explanation for how the RFC accommodates the ALJ's paragraph B's findings, but rather to perform a new, more detailed assessment incorporating *all* the relevant evidence.

JW U. C. v. Comm'r Soc. Sec., No 2:19-CV-00090-DWC, 2019 WL 3451515, at *2 (W.D. Wash. July 31, 2019) (citing SSR 96-8p, 1996 WL 374184, at *4) (noting that the limitations identified in the paragraph B criteria are not an RFC assessment, but are used to rate the severity of mental impairments at steps 2 and 3 of the evaluation process and that the mental RFC assessment used at steps four and five requires "a more detailed assessment.").

### b. Analysis

After finding that Plaintiff had no limitations in the area of understanding, remembering, or applying information and mild limitations in the other paragraph B criteria, the ALJ specifically acknowledged that:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

AR at 23. Despite this acknowledgement and recognition that the mental RFC assessment "requires a more detailed assessment" than that made at step two, the ALJ's discussion of Plaintiff's RFC contains no analysis of Plaintiff's mild mental limitations, which deals solely with the exertional limitations caused by Plaintiff's physical impairments. (See id. at 25-33.) The Court's analysis of these mental impairment

findings, therefore, must be confined to the ALJ's step two analysis, where he rated Plaintiff's degree of limitation with respect to each of the four paragraph B functioning areas.  (See id. at 22-24); see also Darren Jeffrey C. v. Kijakazi, Case No.: 3:21-cv-01012-AHG, 2022 WL 4474261, at *10 (S.D. Cal. Sept. 26, 2022) (noting that the Court's analysis of the ALJ's assessment of the claimant's mental limitations was confined to the ALJ's step two discussion "because the ALJ expressly stated that his later RFC assessment 'reflects the degree of limitation [] found in the paragraph B mental function analysis' at step two, and he did not discuss Plaintiff's mental limitations elsewhere in the opinion.").

Because the Court cannot determine whether the ALJ's decision concerning Plaintiff's mental impairments was based on substantial evidence, as noted above in Sections VI.A.3 and VI.A.4, supra, these deficiencies likewise preclude a meaningful analysis into whether the ALJ properly considered Plaintiff's mental impairments in forming his RFC.  See id. (noting that the question of whether the omission of the plaintiff's non-severe mental functional limitations from the ALJ's ultimate RFC determinations depended on the plaintiff's claim that the ALJ improperly cherry-picked the record evidence).  Yet again, however, the Court finds it helpful to point out possible deficiencies in the ALJ's opinion that could be helpful to the Agency in evaluating Plaintiff's mental limitations once the record is further developed.

Most importantly, the Court notes that the ALJ's written opinion does not articulate why, after finding that Plaintiff had mild mental limitations in three of the four broad paragraph B criteria, he did not include any of those restrictions in the RFC. Despite the ALJ's acknowledgment that a mental RFC assessment "requires a more detailed assessment" than the one made in step two, the ALJ's discussion of Plaintiff's RFC contains no analysis of Plaintiff's mental limitations—even the ones in which he found a mild mental limitation.  See Patricia C. v. Saul, Case No.: 19-cv-00636-JM-JLB, 2020 WL 4596757, at *13 (S.D. Cal. Aug. 11, 2020).  Courts within the Ninth Circuit have found reversible error where the ALJ failed to at least consider mild mental

limitations when assessing the claimant's RFC.  <u>See, e.g.</u>, <u>Aida I. v. Saul</u>, No.: 3:19-cv-00476-AJB-RNB, 2020 WL 434319, at *4–5 (S.D. Cal. Jan. 28, 2020), <u>report and recommendation adopted</u> 2020 WL 1905356 (S.D. Cal. Apr. 17, 2020) (collecting cases).

Defendant points out that courts in the Ninth Circuit have "dispelled Plaintiff's contention that a finding of mild limitations at step two necessitates the inclusion of reduced mental capacities in a claimant's RFC." (J. Mot. at 19 (citing <u>Woods v. Kijakazi</u>, 32 F.4th 785, 788, 793 (9th Cir. 2022)).)  Multiple cases within the Ninth Circuit have also found that a statement from the ALJ that the degree of limitation found in the paragraph B functional analysis was incorporated into the RFC is sufficient to meet the requirements of considering the limiting effects of all impairments.  <u>See, e.g.</u>, <u>Medlock v. Colvin</u>, Case No. CV 15-9609-KK, 2016 WL 6137399, at *5 (C.D. Cal. Oct. 20, 2016) (noting that ALJs are not necessarily required to include every impairment into the RFC if the record indicates the non-severe impairment does not cause a significant limitation in the claimant's ability to work).  The fact that the ALJ stated that he incorporated Plaintiff's mental limitations into the RFC, however, is far from sufficient to show that the ALJ met these requirements.  The ALJ still may not "rely on boilerplate language," and must actually "specif[y] reasons supported by substantial evidence for not including the non-severe impairment in the RFC assessment." <u>Id.</u> at *5.  While the ALJ includes a discussion of whether the medical opinions cited in his analysis of the paragraph B criteria are persuasive, it appears that this section of the opinion merely repeats the analysis from the paragraph B section, without explaining *why* none of these limitations were ultimately discussed in the RFC assessment.  (<u>See</u> AR at 23-24.)  In other words, simply repeating the findings included in the discussion of the paragraph B criteria, without further explanation, is not sufficient to show that the requisite "more detailed assessment" was actually conducted by the ALJ.  These deficiencies will also need to be addressed on remand.

**6.    Conclusion**

The ALJ's failure to properly develop the record to include any of Plaintiff's

mental health treatment history leaves a gap that precludes the court from properly evaluating (1) whether the ALJ's finding that Plaintiff's mental impairments were non-severe is supported by substantial evidence, and (2) whether the ALJ properly discussed the limitations that he found to be non-severe in formulating Plaintiff's RFC. Accordingly, the Court **RECOMMENDS** that the Commissioner's decision be remanded on this basis for further development of the record related to Plaintiff's mental impairments.

**B.     The ALJ's Evaluation of Plaintiff's Physical Impairments**

Plaintiff separately challenges the ALJ's RFC determination as to (1) his foot and back impairments, and (2) his hand and wrist impairments by asserting that the ALJ failed to incorporate greater limitations to his RFC than the Administrative Record actually supports.  (See J. Mot. at 25:25-27.)  The Court will address each of these challenges in turn.

**1.     Relevant parts of the record**

**a.     Plaintiff's foot and back impairments**

**i.     Dr. Goodman**

A bilateral foot examination by Eric Goodman, M.D. on April 17, 2019 revealed a bilateral "plantar calcaneal spur" and right first MTP joint arthrosis.  (See AR at 266.)

**ii.     Dr. Young**

Another bilateral foot examination by Eric Young, M.D. and Amir Hajimirsadeghi, D.P.M. on August 12, 2019 notes that Plaintiff presented to a Sharp Medical Group Clinic with right second and third toe pain.  (See id. at 596.)  The treatment note explains that Plaintiff had been seeing Tony Nguyen, M.D. for foot pain where he had x-rays performed and was issued a "fx walker for comfort."  (Id.)  The treatment notes explains that Plaintiff continued to experience foot pain and wanted to discuss further treatment options.  The note describes Plaintiff's pain as "5-10/10 . . . especially with prolonged standing or walking."  (Id.)  Dr. Young notes that Plaintiff's x-rays were "within normal limits except for arthrosis of the second third toe PIP joints."  (Id. at 598.)  The note

explains that the treatment options discussed with Plaintiff included "rocker-bottom shoes wider toe box shoes and cortisone injection to minimize pain." (Id.)  Plaintiff agreed to a cortisone injection and it was administered at the same visit. (See id.) Dr. Young noted that "[o]therwise his treatment can include second and third toe PIP joint fusion if he continues to have difficulty with ambulation." (Id.)

### iii.    Dr. Messoline

Another treatment note by Tang Phuong, L.V.N. and Matthew Messoline, M.D. on December 17, 2019 explains that while swelling in Plaintiff's second and third toes had decreased within the past few days "following his most recent cortisone injection," the swelling "has been a recurrent issue unfortunately with severe pain at times that can limit range of motion and ambulation[.]" (Id. at 568.)  This treatment note also explains that Plaintiff has "chronic arthritis on the right foot," and that his podiatrist would be initiating an "autoimmune work-up" to determine the cause of his chronic pain. (Id. at 566.)

### iv.    Dr. Horton

A treatment note by Curtis Horton, M.D. and Brenda Saldana, M.A. on December 12, 2019 explains that Plaintiff's bilateral lower extremity varicose veins cause "daily symptoms of cramping, burning, itching, throbbing, heavy discomfort." (Id. at 579.)  The note explains that these symptoms "tend[] to worsen with prolonged standing." (Id.) Noninvasive treatment options such as leg elevation, exercise, the use of compression stockings, maintaining a healthy weight, and other homeopathic remedies were discussed with Plaintiff, along with more invasive options such as vein stripping, laser ablation, radiofrequency ablation, ultrasound guided foam sclerotherapy, conventional sclerotherapy, and dermal laser treatment. (See id. at 582.) The note explains that Plaintiff elected to start with conservative treatment at that time. (See id.)

### v.    Dr. Hajimirsadeghi

A subsequent treatment by Dr. Hajimirsadeghi and Marisol Chavez, L.V.N. on December 10, 2020 notes that Plaintiff's pain did not improve. (See id. at 505.)  After

discussing the risks of surgery, Plaintiff elected to schedule a "PIP joint fusion and possible arthroplasty of the DIP joints." (Id.)  The note explains that Plaintiff was given alternate treatment options such as a silicone gel pad and shoes with wider toe boxes, but that Plaintiff decided to try the surgical option. (Id.)

### vi.    Dr. Sabourin

Notes describing an orthopedic consultation performed by Thomas Sabourin, M.D. on February 24, 2020 explain that Plaintiff's right foot had a palpable spur on the dorsum of the second metatarsophalangeal joint, but he had "relatively good motion at that joint with minimal pain or tenderness at this point." (Id. at 438.)  Dr. Sabourin noted that Plaintiff's "right foot is doing pretty well at this time . . . He does have some arthritis in that toe, which could bother his forefoot from time to time." (Id. at 439.)  Additionally, Dr. Sabourin noted that "[Plaintiff] does have spondylosis in the lumbar spine with osteopenia and may have some mild compression fractures in the thoracic spine due to his significant kyphosis." (Id. at 439-40.)  After noting that Plaintiff "does have some significant limitations," Dr. Sabourin opined:

> He could only lift or carry 20 pounds occasionally and 10 pounds frequently.  He could stand and walk up to 6 hours of an eight-hour workday and sit for 6 hours of an eight-hour workday. Push/pull limitations would be equal to lift/carry limitations.  He could climb, stoop, kneel, and crouch frequently.  He has no significant manipulative limitations, given a prognosis of 1 year. Other than, he could do gross manipulation such as handling torquing and grasping with both wrists only frequently due to his basal joint arthritis.  I do not feel he needs an assistive devices [sic] to ambulate at this point.

(Id. at 440.)

### vii.    Dr. Messoline's RFC questionnaire

In a residual functional capacity questionnaire dated January 7, 2021, Dr. Messoline opined that Plaintiff would need to elevate his legs to heart level or higher for three to four hours per eight-hour workday due to his edema and arthritis. (See id. at

471.)  Dr. Messoline also opined that Plaintiff would be able to sit for two to three hours a day, could stand for fifteen to twenty minutes at a time, and that he would need to alternate between sitting and standing in an eight-hour workday.  (See id.)  Dr. Messoline noted that Plaintiff required a cane to ambulate, and that Plaintiff could rarely lift and carry less than ten pounds, and could never carry ten, twenty, or fifty pounds.  (See id. at 472.)  Additionally, Dr. Messoline opined that Plaintiff could rarely twist and bed, and that he could never crouch, or climb ladders or stairs.  (See id.)

### viii.   Dr. Nicholson

In relevant portion to Plaintiff's arguments, Dr. Nicholson noted that Plaintiff does not cook his own meals and that someone else helps him with his laundry.  (See id. at 429.)

### ix.   Hearing Testimony

During the hearing, Plaintiff testified that he has days where "it feels like I put my foot up against a hot stove with the pain.  I'm not able to wear covered shoes."  (Id. at 48.)  Additionally, Plaintiff testified that elevating his feet is the only thing that helps with the swelling issues.  (See id. at 51.)  Finally, Plaintiff testified that "there's something pinching a nerve between my back and my kidneys.  My whole right side, it just makes it very hard to even get out of bed in the morning, I have to roll."  (Id. at 48.)

### b.   Hand and wrist impairments

### i.   Dr. Sabourin

Although Dr. Sabourin was unable to assess Plaintiff's right arm in his February 24, 2020 consultation notes because it was in a cast, he noted that Plaintiff had "a somewhat positive Tinel sign . . . in the left elbow, which causes some tingling, but he has no motor or sensory loss from that problem.  (Id. at 438.)  Plaintiff also contends that Dr. Sabourin's opinion regarding Mr. Hepler's right wrist was "speculative and relative," explaining that "[Plaintiff's] right wrist with a prognosis of 1 year will probably do reasonably well."  (J. Mot. at 25:9-11 (citing id. at 439).)

### ii.     Dr. Messoline

In a treatment note dated November 3, 2020, Dr. Messoline found that Plaintiff had right wrist pain, DeQuervains tenosynovitis, pain, sensory disturbance, and "[d]ifficulty performing ADLs."  (AR at 465.)  A December 7, 2020, treatment note explains that Plaintiff had right radial wrist pain with a "locking" feeling.  (Id. at 463.)  Dr. Messoline instructed Plaintiff to "[l]ift/carry with two hands or palm up to avoid radial wrist strain."  (Id.)  On December 29, 2020, Dr. Messoline noted that Plaintiff had continued wrist pain and that he was considering surgical treatment for "bone on bone" symptoms.  (Id. at 466.)  Dr. Messoline instructed Plaintiff in how to use a dycem to open jars "and lessen hand strain."  (Id.)

### iii.     Hearing testimony

During the hearing, Plaintiff testified that the loss of cartilage in his right hand causes him to use "two hands just to lift a pot of coffee to pour the water in it in the morning.  Everything I do is with my right hand."  (Id. at 47.)  Additionally, Plaintiff noted that "[j]ust to shower and to use [his] right hand to wash and it's painful, it's not impossible."  (Id. at 51.)

### c.     The ALJ's opinion

The ALJ's RFC determination was as follows:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he should never climb ropes, ladders, or scaffolds; could frequently balance; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; could frequently handle and finger with the right upper extremity; could occasionally perform forceful grasping or torquing motions on the right; and, should avoid concentrated exposure to extreme cold, unprotected heights, and moving and dangerous machinery.

(Id. at 24-25.)

Related to Plaintiff's foot impairments,[2] the ALJ noted that Dr. Nguyen found that Plaintiff had:

> decreased right first metatarsophalangeal (MTP) range of motion with about 40 degrees dorsiflexion; mild to moderate complaints of tenderness of the right second and third metatarsal heads; hammertoe deformities of the right second, third, fourth toes; mild to moderate tenderness at the right second and third interspace; moderate decreased medial column with subtalar joint overpronation upon weightbearing; and, ankle joint dorsiflexion zero degrees with knee flexed/extended consistent with equinus deformity.

(Id. at 28 (citing id. at 324)).  Dr. Nguyen noted, however that: "ankle dorsiflexors, plantarflexors, invertors, and evertors were normal with five out of five muscle strength in the four compartments of the legs and intrinsic musculature of the feet bilaterally; and, mild tenderness at the mid arch plantar fascial ligament of the right foot."  (Id.) Additionally, although Dr. Hajimirsadeghi noted pain and swelling in Plaintiff's second and third right toes, Plaintiff's x-rays were in normal limits, and that it was recommended that he try wider toe box shoes and cortisone injections.  (See id. at 28-29.)  The ALJ also cited to Dr. Hajimirsadeghi's notes that Plaintiff had tried to hike for over an hour but could not because of his pain, and that Plaintiff was wearing close toed shoes with no socks, which caused significant irritation at the tips of his toes.  (Id. at 29 (citing id. at 502-03).)

With respect to Plaintiff's hand and wrist impairments, the ALJ noted that although Plaintiff reported that steroid anesthetic injections of his right wrist did not help his

---

[2] Although Plaintiff mentions that the ALJ failed to properly evaluate his back impairments, as Defendant correctly points out, Plaintiff never alleged that he had a severe medically determinable back impairment in his application for benefits. (J. Mot. at 28:7-9.)  The Court will therefore only analyze the ALJ's determination of Plaintiff's foot impairments.  See Manuel V. v. Kijakazi, Case No. 2:21-cv-03757-FMO (MAA), 2022 WL 3576238, at *1 (C.D. Cal. Aug. 8, 2022) (citing Macri v. Chater, 93 F.3d 540, 545 (9th Cir. 1995)) (rejecting claimant's arguments about a particular impairment that did not appear in the claimant's application for disability benefits).

symptoms, treatment records from Bradford Stiles, M.D. in 2018 explained that Plaintiff did not have any swelling, did not have any skin changes, did not have any soft tissue swelling, and "upon range of motion, normal flexion, extension, radiation deviation, and ulnar deviation; and, negative Finklestein's test." (Id. at 26 (citing id. at 620).) Additionally, although the ALJ noted that Plaintiff elected to pursue surgical interventions for his continued wrist pain, Alon Garay, M.D. explained in June of 2019 that there were no cuts or scratches, that Plaintiff was able to make a complete fist and fully extend all digits, "he had [an] intact wrist range of motion equal to contralateral side; no evidence of stenosing tendovaginitis; negative Tinel and Finkelstein; and, he was neurologically and vascularly intact." (Id. at 26-27 (citing id. at 300).) The ALJ noted the same findings after another surgical procedure that Plaintiff had in January of 2020 and again in February of 2020. (See id. at 26.) The ALJ noted in September of 2020 that although Plaintiff complained of tenderness to palpation of Plaintiff's wrist, "there were no longer complaints of tenderness in the first dorsal extensor compartment; normal Finkelstein; he was able to make a full fist and fully extend all digits; palmar flexion was 60 degrees and doriflexion was 40 degrees; and, he was neurologically and vascularly intact." (Id. at 27 (citing id. at 520).)

The ALJ found Dr. Sabourin's opinion "partially persuasive," assessing more severe limitations in Plaintiff's ability to frequently climb, stoop, kneel, and crouch, his limitations in balancing, crawling, and fingering on the right, and that he had no environmental limitations. (Id. at 31-32.) This was due in part to the ALJ's evaluation of Plaintiff's x-ray results, which the ALJ noted that Dr. Sabourin did not have the occasion to review. (See id.)

Finally, the ALJ found Dr. Messoline's opinion unpersuasive. Noting that Plaintiff had reported improvements and physical activity before electing to have right foot surgery, as well as longitudinal medical evidence which revealed normal motor strength, normal sensation, and normal gait, the ALJ found that Dr. Messoline's opinion "was not supported by the objective medical evidence." (See id. at 32.) Additionally, The ALJ

found that Dr. Messoline placed too much reliance on Plaintiff's subjective complaints over the phone without the opportunity to examine him, and that some of Dr. Messoline's findings were inconsistent with Dr. Garay's normal findings after Plaintiff had undergone surgery.  (Id. at 32.)

### 2. Parties' arguments

Plaintiff argues that each of the medical findings listed above established greater limitations in the RFC than the ALJ assessed.  (J. Mot. at 25:1-3; 25:25-27.)  Specifically, Plaintiff contends that the RFC ignored Dr. Messoline's opinion that Plaintiff would require a cane to walk, that he would need to elevate his feet during the day, and that he would need special shoes to walk effectively.  (See id. at 30:12-17.)  Plaintiff argues that the ALJ also did not account for Dr. Messoline's instructions to Plaintiff to use a dycem to open jars and lift and carry with two palms up to avoid wrist pain.  (See id. at 30:19-23.)  Furthermore, Plaintiff appears to argue that the ALJ did not properly account for the limitations assessed by Dr. Sabourin, which vaguely assessed a "relatively good" range of motion and noted that his arthritis "could bother his forefoot from time to time.  (Id. at 24:8.)  These limitations, if properly accounted for by the ALJ, would have led to a more restrictive RFC, and Plaintiff contends that remand is necessary to correct these problems.  (See id.)

In response, Defendant contends that the ALJ properly weighed the medical evidence, Plaintiff's demonstrated capabilities, treatment history, and opinions in the record to arrive at Plaintiff's RFC.  (See id. at 26:22-25.)  First, Defendant argues that the ALJ properly explained that although the clinical findings in the record established significant limitations, the ALJ also properly noted "significant residual capabilities." (See id. at 27-28.)  Second, Defendant argues that the ALJ properly considered the evidence that Plaintiff identified above, using it in several places throughout his written decision to craft a "restrictive RFC that accounted for Plaintiff's . . . limitations."  (See id. at 28-29.)  Finally, Defendant argues that the ALJ properly considered the opinions of Dr. Sabourin and Dr. Messoline by comparing their conclusions to other evidence in the

record and formulating an RFC that he found consistent with the parts of their opinion that he determined were persuasive.  (See id. at 29-30.)  Accordingly, Defendant contends that the ALJ's decision should be affirmed.

### 3.    Applicable law

An RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations.  20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.945(a); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (noting that the RFC reflects current "physical and mental capabilities"); SSR 96-8p, at *2.  Thus, it represents the maximum amount of work the claimant is able to perform based on all the relevant evidence in the record.  See id.; see also 20 C.F.R. § 416.945(a)(3) (explaining that an RFC determination must be "based on all of the relevant medical and other evidence.").

The RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  See 20 C.F.R. §§ 404.1527(d)(2), 404.1546(c); Vertigan, 260 F.3d at 1049 ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.") (citing 20 C.F.R. § 404.1545).  Where "the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict."  Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003); Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999) (holding that ALJ was "responsible for resolving conflicts" and "internal inconsistencies" within doctor's reports); Tommasetti v. Astrue, 533 F.3d 1035, 1041–42 (9th Cir. 2008) ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").

The ALJ must include all of a claimant's impairments in the RFC assessment.  20 C.F.R. §§ 404.1545, 416.945; see also Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009).  Because the assessment of a claimant's RFC is essential to steps four and five of the sequential analysis in determining whether a claimant can still work despite severe medical impairments, an improper evaluation of the claimant's ability to

perform specific work-related functions "could make the difference between a finding of 'disabled' and 'not disabled.'" SSR 96–8p, 1996 WL 374184, at *4.  Accordingly, "an RFC that fails to take into account a claimant's limitations is defective."  Valentine v. Comm'r. Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009); see also Martin v. Comm'r Soc. Sec. Admin., 472 Fed. App'x 580, 580 (9th Cir. 2012) (concluding that the ALJ erred in formulating RFC by failing to incorporate medical opinion of claimant's work limitations without providing specific and legitimate reasons for doing so and finding VE's testimony based on flawed RFC that had no evidentiary value).  In determining whether an ALJ committed error in assessing the RFC, the relevant inquiry is whether the medical evidence supports the ALJ's finding.  See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173–74 (9th Cir. 2008) (holding the RFC assessment adequately captures restrictions if it is consistent with the concrete limitations in the medical opinions); see also Schneider v. Comm'r Soc. Sec. Admin., 433 Fed. App'x. 507, 509 (9th Cir. 2011) (concluding that the ALJ's failure to address claimant's migraines was harmless because medical record did not support finding that migraines would affect claimant's functioning at work).

### 4.    Analysis

Plaintiff's arguments about the ALJ's formulation of his RFC regarding his physical impairments are unavailing.  First, Plaintiff cites to scattered incidents in the record that he argues should have resulted in a more restrictive RFC finding.  (See, e.g., J. Mot. at 23:13-24:3 (citing multiple findings in which providers noted that Plaintiff's symptoms could worsen with prolonged standing or walking); 25:12-21 (citing findings by Dr. Messoline that noted Plaintiff's symptoms and concluding that they could interfere with his ability to perform ADLs).)  While these limitations assessments *could* lead to more restrictive limitations than the ones that the ALJ ultimately incorporated into the RFC, the ALJ's duty is to synthesize *all* of the medical evidence from the Administrative Record.  See Morgan, 169 F.3d at 603.  As such, "[t]he ALJ's RFC determination need not precisely reflect any particular medical provider's assessment."  Althoff-Gromer v.

Comm'r Soc. Sec., No. 2:18-cv-00082-KJN, 2019 WL 1316710, at *13 (E.D. Cal. Mar. 22, 2019); see also Chavez v. Colvin, 654 Fed. App'x 374, 375 (10th Cir. 2016) (noting that an ALJ need not "parrot . . . exact descriptions of . . . limitations" to reach an RFC determination consistent with the medical record and claimant's limitations).

Here, a plain reading of the ALJ's decision demonstrates that while the ALJ did acknowledge some significant symptoms, he also weighed evidence of normal findings in the record that revealed a normal range of motion in Plaintiff's wrist, full strength in his wrist and hand, that he was able to make a complete fist and fully extend all fingers, as well as negative Tinel's and Finkelstein's testing. (See AR at 26-27 (citing id. at 300, 313, 620, 624).) These normal findings extended into 2020 and included reports that Plaintiff had improved with surgery and cortisone injections. (See id. at 27.) A similar story is told by the ALJ's analysis of Plaintiff's foot impairments, which noted severe symptoms of pain and tenderness in Plaintiff's second and third toes, but that Plaintiff maintained full strength in his lower right extremity, that he had normal gait, and could walk without assistive devices. (See id. at 27-28 (citing id. at 324, 437, 454, 596, 604).) These findings properly accounted for Plaintiff's alleged symptoms. See, e.g., Noel V. v. Saul, No. ED CV 19-00270-DFM, 2020 WL 996789, at *3 (C.D. Cal. Feb. 28, 2020) (concluding that the ALJ did not err when contrasting symptoms from some medical examinations in the record with others that indicated normal findings).

Second, the ALJ properly discounted some of Plaintiff's symptom testimony as inconsistent with other evidence in the longitudinal medical record. For example, in discussing Plaintiff's wrist impairments, the ALJ noted that while Plaintiff consistently explained that he had wrist pain at the sight of his wrist surgery, other doctors recorded that Plaintiff was working in his garden and weightlifting. (AR at 27-28 (citing id. at 522 & 513).) In discussing Plaintiff's foot impairments, the ALJ noted that Plaintiff had discussed trying to hike for over an hour, but that he could not continue because of the pain in his foot. (See id. at 29 (citing id. at 502).) The ALJ also noted that some of Plaintiff's own actions appeared to make some of his symptoms worse—such as his

continued use of flip-flops with bare feet and wearing close-toed shoes without socks. (See id. at 28-29 (citing id. at 325 & 503).)

In sum, the ALJ points to numerous examples in the record to support his finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not consistent with other evidence in the record.  See Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (noting that an ALJ may reject symptom testimony based on credibility evaluation, such as the claimant's reputation for lying and internal contradictions with the record); see also Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").  Plaintiff's vigorous citations to other findings in the record that *might* result in a different RFC assessment amount to a request for the Court to reweigh the medical evidence.  Where evidence exists to support more than one rational interpretation, the Court must defer to the ALJ's decision.  See Shaibi v. Berryhill, 883 F.3d 1102, 1108 (9th Cir. 2017) ("As [the Court] cannot say that the ALJ's interpretation of the available evidence was not rational, the ALJ's conclusions were supported by substantial evidence"); see also Tommasetti, 533 F.3d at 1038 (noting that courts uphold the ALJ's conclusion where the evidence is susceptible to more than one rational interpretation).

Finally, the ALJ also properly considered the medical opinions of Drs. Sabourin and Messoline.  Plaintiff argues that Dr. Sabourin's opinion was not sufficiently clear, pointing to treatment notes' discussion of Plaintiff's "relatively good" range of motion in his metatarsophalangeal joint without an explanation of what that finding meant, as well as his failure to examine Plaintiff's right wrist during the examination because it was in a cast.  (See J. Mot. at 24; 25.)  As best as the Court can tell, Plaintiff argues that the ALJ failed to properly contrast Dr. Sabourin's limitations assessment, which was less restrictive than his final RFC determination, with other, more restrictive opinions in the record—such as Dr. Messoline's.  (See id. (contrasting Dr. Sabourin's opinion with Dr. Messoline's more restrictive limitations assessment).)  The problem with this assertion,

however, is that the ALJ was not required to contrast Dr. Sabourin's opinion with that of a particular healthcare provider.[3]  Rather, the ALJ was merely required to explain how he analyzed the medical opinions, treatment records, and Plaintiff's own testimony in formulating the RFC.  Nothing that Plaintiff points to in his discussion of the ALJ's consideration of Dr. Sabourin's opinion rises to the level of rejecting this analysis.  Indeed, the ALJ assessed *more* restrictive limitations than Dr. Sabourin in the areas of climbing, stooping, kneeling, crouching, balancing and crawling, fingering with his right hand, and environmental limitations, concluding that Dr. Sabourin's opinion about these limitations was inconsistent with other medical evidence, such as Plaintiff's x-ray results.  (See AR at 31-32.)  Even if the interpretation of the evidence that Plaintiff advances could give rise to inferences that are more favorable to Plaintiff, the Court cannot second guess the ALJ's interpretation of this opinion.  See, e.g., Deyon v. Kijakazi, Case No. 1:20-cv-01532-SKO, 2022 WL 1782465, at *8 (E.D. Cal. June 1, 2022) (concluding that the ALJ gave sufficient reasons for rejecting a portion of a doctor's opinion by assessing more restrictive limitations that the ALJ determined were consistent with other evidence in the record).

Plaintiff's insistence that the ALJ should not have rejected Dr. Messoline's more restrictive opinion suffers from the same flaws.  (See J. Mot. at 24:12-17; 25:12:21.)  Having discounted several parts of Plaintiff's subjective symptom testimony as inconsistent with other evidence in the record, the ALJ rejected Dr. Messoline's opinion partly because it relied so heavily on such statements.  (See AR at 32); see also Garcia v. Comm'r Soc. Sec., Case No. 1:21-cv-01799-SAB, 2023 WL 4162766, at *11 (E.D. Cal. June 22, 2023) (noting that an ALJ can reject a physician's opinion as relying too heavily

---

[3] For applications, like Plaintiff's filed on or after March 27, 2017, the new regulations state an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources." 20 C.F.R. § 404.1520c(a).  Instead, an ALJ is to evaluate opinions by considering their "persuasiveness." Id.

on a plaintiff's subjective symptom testimony, which was discounted in other places in the ALJ's decision).  Furthermore, the ALJ properly rejected Dr. Messoline's opinions because they were inconsistent with his own examination findings that showed normal range of motion, normal motor strength, and sensation, and a normal gait, as well as a lack of medical support for Plaintiff's need to ambulate with assistive devices.  (See AR at 32 (citing id. at 324, 437, 454, 596, 604).)  The ALJ supported his evaluation of Dr. Messoline's opinion with an articulated analysis of the record and citation to specific evidence that led him to find it unpersuasive.  Accordingly, the Court will not disturb the ALJ's findings.

On the record as it relates to Plaintiff's physical limitations, the Court concludes that the ALJ's articulated reasons for formulating Plaintiff's RFC were supported by substantial evidence.  The ALJ did not err in this aspect of his decision.

**C.    The ALJ's Step Four Finding**

**1.    Hearing testimony and the ALJ's decision**

At the hearing, the VE categorized Plaintiff's past relevant work to be that of a floral designer (Dictionary of Occupational Titles ("DOT") 142.081-010) and meeting planner (DOT 169.117-002).  (AR at 52-53.)  During the hearing, the ALJ asked the VE whether a hypothetical individual of Plaintiff's age, education, and past relevant work background with the RFC limitations found by the ALJ could perform Plaintiff's past work.  (See id. at 54.)  The VE responded that because the floral designer position would involve "constant handling and fingering," that position would be precluded,[4] but that the hypothetical individual could perform the meeting planner position.  (Id.)  The ALJ asked the VE if her testimony was consistent with the DOT, which the VE answered in the affirmative, without any additional testimony.  (Id.)  After a clarifying question from

---

[4] The ALJ ultimately did not identify the floral designer position as an occupation that Plaintiff could perform.  (See AR at 33.)

Plaintiff's counsel about the need for a hypothetical individual to elevate his legs for four hours out of every eight-hour shift, the VE concluded that such a restriction would not be acceptable for an individual to perform Plaintiff's past work.  (See id. at 54-55.)  the VE clarified that although the DOT was silent as to the requirements for such a hypothetical individual to raise his legs for four hours during each shift, her testimony was based on her "vocational field experience, education, and training."  (Id. at 55.)  The ALJ's written opinion then determined that Plaintiff could perform his past relevant work as a meeting planner as generally performed.  (See id. at 33.)

### 2.    Parties' Arguments

Plaintiff contends that the ALJ failed to resolve an apparent conflict between the VE's testimony during the hearing and the DOT because the meeting planner occupation (DOT 169.117-022) does not exist within the current version of the DOT.  (J. Mot. at 6:6-9.)  Noting that the meeting planner position is listed in a SkillTRAN database as an unpublished code created after the Department of Labor finalized the current version of the DOT, Plaintiff cites to an emergency message published by the Social Security Administration that warns ALJs to elicit a reasonable explanation for any conflicts between these unpublished job codes and the DOT. (See id. at 5 (citing Emergency Message 21065,[5] Updated OccuBrowse Launch and Guidelines for Using Occupational Information in Electronic Tools).)  By failing to resolve this apparent inconsistency, Plaintiff argues that the ALJ's step four finding that he could perform the meeting planner position was not supported by substantial evidence.  (See id. at 6.)

In response, Defendant argues that although the meeting planner occupation is not included in the most recent version of the DOT, the ALJ's step four determination relied on the VE's testimony, which "rested not only on the DOT, but on the [VE's] own expertise and experience.  Accordingly, no further inquiry into the [VE's] testimony was

---

[5] https://secure.ssa.gov/apps10/reference.nsf/links/10292021113305AM.

required." (Id. at 7:1-4 (citing 20 C.F.R. § 404.1560(b)(2); Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005)).)  Defendant further contends that the ALJ was not prohibited from considering occupations outside of the most recent version of the DOT.  (Id. at 7.)  Even though Emergency Message 21065 cautions ALJs not to take administrative notice of unpublished occupations and to reconcile any potential conflicts between SkillTRAN listings and the DOT, Defendant argues the ALJ properly relied on the VE's testimony by specifically inquiring as to whether the VE's testimony conflicted with the DOT, which the VE answered in the negative during the hearing.  (Id. at 7:19-22.)  Finally, Defendant argues that VE's reliance on the meeting planner occupation did not create a conflict between the DOT's job description and the VE's testimony—as the meeting planner's DOT description was consistent with the RFC that the ALJ formulated.  (Id. at 7-8.)  Accordingly, Defendant contends that the ALJ's decision was supported by substantial evidence and should be affirmed.  (Id.)

### 3. Applicable law

Although the burden of proof lies with the claimant at step four of the sequential evaluation process, "the ALJ still has a duty to make the requisite factual findings to support his conclusion." Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001).  An ALJ's determination that a claimant has the RFC to perform his past relevant work must contain findings of fact as to the physical and mental demands of the past occupations, and that the claimant's RFC would permit him to return to these past positions.  See SSR 82-62.

The ALJ is also permitted to utilize a VE to assist in this determination.  See 20 C.F.R. § 404.1560(b)(2).  When a VE provides evidence about the requirements of a claimant's past job, the ALJ has "an affirmative responsibility to ask about any possible conflict" between that testimony and the DOT, and to ask for a reasonable explanation for any deviation.  See SSR 004p.  This requires an ALJ to inquire as to whether the VE's testimony conflicts with the DOT.  See Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007).  A conflict between the VE's testimony and the DOT exists when the VE's

testimony is obviously or apparently contrary to the DOT's listing of job requirements that are "essential, integral, or expected."  Gutierrez v. Colvin, 844 F.3d 804, 808 (9th Cir. 2016).

In making a determination as to whether appropriate jobs exist for a claimant or whether the claimant can perform his past relevant work, the VE should generally refer to the DOT.  See Light v. Soc. Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997).  SSR 004p requires that the ALJ determine whether the VE's testimony deviates from the DOT, and whether there is a reasonable explanation for any such deviation.  SSR 004p (noting that an ALJ must inquire as to whether a VE's testimony regarding the requirements of a job conflicts with the DOT).  In making disability determinations, the ALJ may rely on VE testimony that contradicts the DOT, but only insofar as the record contains persuasive evidence to support any deviation.  See Light, 119 F.3d at 793; Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995); Massachi, 486 F.3d at 1153.  Although evidence provided by the VE should generally be consistent with the DOT, "[n]either the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict."  SSR 004p.  The ALJ must accordingly first determine whether a conflict exists, and if there is a conflict, he must then determine whether the VE's explanation for the conflict is reasonable and whether a basis exists for relying on the VE rather than the DOT.  See id. (where a VE's testimony apparently conflicts with the DOT, the ALJ "must resolve this conflict before relying" on the VE's testimony and "must explain the resolution of the conflict irrespective of how the conflict was identified").  This requirement is not limited to when the VE affirmatively testifies that there is a conflict between their testimony and the DOT.  Where a VE incorrectly testifies that there is no conflict, but evidence from the VE appears to conflict with the DOT, SSR 004p requires additional inquiry—an ALJ must "obtain a reasonable explanation for any apparent conflict."  See Massachi, 486 F.3d at 1152-53 (citing SSR 004p).  Even if the VE did not identify the conflict, the ALJ errs if he fails to obtain a reasonable explanation for any apparent deviation from the DOT.  See, e.g., Gonzalez v. Berryhill, No. CV 18-3948-PLA, 2019 WL 285924, at *4 (C.D.

Cal. Jan. 22, 2019) ("the ALJ errs if she fails to obtain a reasonable explanation to resolve an apparent conflict—even if the VE did not identify the conflict").

Only after the ALJ has reconciled any deviation from the DOT in the VE's testimony can the ALJ properly rely on the VE's testimony as substantial evidence to support a disability determination. <u>See Massachi</u>, 486 F.3d at 1152-54. Evidence to support a deviation from the DOT can be in form of specific factual findings regarding a claimant's ability to perform particular jobs, or inferences drawn from the context of the VE's testimony. <u>See, e.g.</u>, <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1279 (9th Cir. 1990) (ALJ may infer support for deviation where VE's understanding of applicable legal standards is clear from context). An ALJ's failure to resolve an apparent inconsistency can result in a gap in the record that precludes a court from determining whether an ALJ's step-four determination is supported by substantial evidence. <u>See Zavalin v. Colvin</u>, 778 F.3d 842, 846 (9th Cir. 2015). An error of this kind is therefore not harmless if it fails to reconcile any unresolved inconsistencies in the evidence. <u>See Massachi</u>, 486 F.3d at 1153, 1154 n.19.

### 4. Analysis

The Court is not convinced that the ALJ's step four determination was supported by substantial evidence. Although the parties appear to agree that the ALJ could have considered the VE's testimony about the unpublished job code of meeting planner on the SkillTRAN website, (<u>compare id.</u> at 7:8-15 ("Plaintiff identifies no authority stating that a vocational expert is prohibited from considering DOT occupations identified after the most recent version of the DOT was published."), <u>with id.</u> at 9:3 ("a VE can testify to information outside of the DOT")), Plaintiff argues that the absence of such a code in any Department of Labor publications—including the DOT—is an apparent conflict that triggered the ALJ's duty to make an additional inquiry into any inconsistencies between the VE's testimony and the DOT. (<u>See id.</u> at 9:3-5 ("while a VE can testify to information contained outside of the DOT, she must testify consistently with the DOT *or* the ALJ must elicit an explanation to resolve the conflict between the DOT and the VE's

testimony under the requires of [SSR 004p].").)  Courts within the Ninth Circuit have agreed, concluding that the VE's use of a job code outside of the DOT during a hearing is an apparent conflict that the ALJ is required to elicit additional testimony to resolve.  See, e.g., James S. v. Comm'r Soc. Sec. Admin., Case No. 3:18-cv-00394-JO, 2019 WL 4345662, at *5 (D. Or. Sept. 11, 2019) (concluding that the ALJ erred when he failed to seek clarification from the VE about an occupation that did not exist in the DOT).

Defendant argues that the ALJ's question to the VE as to whether her testimony was consistent with the DOT was sufficient to support the ALJ's ultimate finding without any additional foundation.  (See J. Mot. at 6: 26-7:7 ("the ALJ relied on the vocational expert's testimony, which rested not only on the DOT, but on the vocational expert's own expertise and experience.").)  The fact that the ALJ relied on a job code that is outside of the DOT, however, is a discrepancy between the VE's testimony and the DOT that required the ALJ to elicit further clarification before relying on the VE's testimony—whether it was backed by the VE's own expertise or not.  See Gutierrez v. Colvin, 844 F.3d 804, 807 (9th Cir. 2016) (citing SSR 004p) ("If the expert's opinion that the applicant is able to work conflicts with, or seems to conflict with, the requirements listed in the [DOT], then the ALJ must ask the expert to reconcile the conflict before relying on the expert to decide if the claimant is disabled."); Lamear v. Berryhill, 865 F.3d 1201, 1205 (9th Cir. 2017) (noting that the ALJ's role is to resolve apparent conflicts between the vocational expert's testimony and the DOT).  The need for an ALJ to be especially careful when relying on a VE's testimony about job codes outside of the DOT is highlighted by Emergency Message 21065, which warns that ALJs need to elicit further explanation from the VE if their testimony about a non-DOT job conflicts with the most recent version of the DOT:

> 2. Obtain VS or VE evidence before relying on any of the following content: . . .
>
> b. Occupations that were not published in the 1991 DOT and SCO. While a VS or VE could provide evidence that considers

an occupation not published in the DOT, adjudicators must be careful not to take administrative notice of SkillTRAN content added after 1991 when the DOT was last updated. Additionally, adjudicators must elicit a reasonable explanation for any conflict between the VS or VE evidence and the DOT before relying on the VS or VE evidence to support a determination or decision about whether the claimant is disabled. See DI 25015.030.

Emergency Message 21065.

Here, apart from a cursory question to the VE as to whether her testimony was consistent with the DOT and Selected Characteristics of Occupations (AR at 54), the ALJ did not ask for any further explanation for the VE's departure from the DOT by relying on an unpublished DOT code. Defendant argues that the ALJ's failure to obtain any further explanation is immaterial, as the meeting planner occupation "is consistent with Plaintiff's RFC—in pertinent parts." (J. Mot. at 8:3.) It may very well be true that the meeting planner occupation was consistent with the Plaintiff's RFC—but that is not the Court's inquiry at this juncture.[6] An ALJ is required to obtain a reasonable explanation for an apparent deviation from the DOT. See Gonzalez, 2019 WL 285924, at *4 ("the ALJ errs if she fails to obtain a reasonable explanation to resolve an apparent conflict— even if the VE did not identify the conflict"); see also Halde v. Saul, Case No. 2:19-cv-01247-EJY, 2020 WL 4470445, at *8 n. 14 (D. Nev. Aug. 3, 2020) (quoting Padilla v. Berryhill, Case No. 2:18-cv-02126-VCF, 2020 WL 1244132, at *5 (D. Nev. Mar. 16, 2020)) ("the ALJ only needs to resolve conflicts between VE testimony and one source –

---

[6] In arguing that the Court should disregard the ALJ's failure to reconcile the unpublished meeting planner code with the DOT, Defendant's portion of the Joint Motion notes that the description of the meeting planner occupation that the VE cited to is attached as an exhibit. (See J. Mot. at 8:2-6 ("the DOT states that the occupation is a light-exertional occupation entailing frequent handling, occasional fingering—and Plaintiff does not assert otherwise. See DOT Code No. 169.117-022 (attached).") Although that code description is not attached to the Joint Motion, Defendant's *post hoc* attempts to explain why that code is consistent with Plaintiff's RFC highlights the problem with that position. Citing to an unpublished DOT code leaves a gap in the record that makes it impossible to determine whether the VE's testimony was consistent with Plaintiff's RFC, and the Court declines to perform that analysis after the ALJ had an opportunity to clarify this discrepancy, but failed to do so.

the DOT (and its companion publication the [SOC]).") (internal quotations omitted). Failing to do so, as happened here, leaves a gap in the record that precludes the Court from determining whether an ALJ's step four determination was supported by substantial evidence. Accordingly, the Court concludes that the ALJ erred when he failed to seek clarification from the VE about the meeting planner occupation and **RECOMMENDS** that the Commissioner's decision be remanded on this basis.

## VII. REMAND

A reviewing court has discretion to remand an action for further proceedings or for a finding of disability and an award of benefits. See, e.g., Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985) (decision of whether to remand for further proceedings or remand for immediate payment of benefits is within the discretion of the reviewing court). Whether an action is remanded for further proceedings or for an award of benefits depends on the likely utility of additional proceedings. Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000). In determining whether an award of benefits is warranted, the Court conducts the "three-part credit-as-true" analysis. Garrison v. Colvin, 759 F.3d 995, 1020 (9th Cir. 2014). Under this analysis the Court considers whether: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence; (2) the record has been fully developed and further proceeding would serve no useful purpose; and (3) if the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled on remand. See Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015).

Even if all the requisites are met, however, the court may still remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]" Garrison, 759 F.3d at 1021. "Serious doubt" can arise when there are "inconsistencies between [the claimant's] testimony and the medical evidence," or if the Commissioner "has pointed to evidence in the record the ALJ overlooked and explained how that evidence casts into serious doubt" whether the claimant is disabled under the Act. Dominguez, 808 F.3d at 407 (quoting Burrell v. Colvin, 775 F.3d 1133,

1141 (9th Cir. 2014) (internal quotations omitted)).  The first requirement is met here based on the ALJ's harmful legal errors.  As discussed above, the ALJ erred in evaluating Plaintiff's mental impairments at step two.

As for the second requirement, the Ninth Circuit has held that remanding for further proceedings rather than for an immediate payment of benefits serves a useful purpose where "the record has [not] been fully developed [and] there is a need to resolve conflicts and ambiguities."  Treichler v. Comm'r Soc. Sec. Admin., 775 F.3d 1090, 1101 (9th Cir. 2014) (internal quotations and citations omitted).  "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits."  Leon v. Berryhill, 880 F.3d 1041, 1045 (9th Cir. 2018) (citing id. at 1099).  "The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court."  Trevizo v Berryhill, 871 F.3d 664, 682 (9th Cir. 2017) (quoting Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987)).  The Court concludes that the record is sufficiently ambiguous, making remand for an immediate payment of benefits inappropriate.  The ALJ's failure to develop the record with respect to Plaintiff's mental health records deprives the Court of the ability to determine whether his conclusions were supported by substantial evidence.  Accordingly, this case should be remanded for further administrative proceedings to allow for proper consideration of the evidence of record and conduct any further necessary proceedings.

The Court concludes that the "rare circumstances that result in a direct award of benefits are not present in this case."  Leon, 880 F.3d at 1047.  Where—as happened here—the ALJ fails to properly develop the record with regard to a claimant's impairments, further administrative proceedings could remedy the ALJ's errors, and remand is appropriate.  See, e.g., Michael K., 2019 WL 7819554, at *8 (citing Mayes, 275 F.3d at 459-60) ("the inadequate record triggered the ALJ's duty to conduct an appropriate inquiry and develop the record further.").

1

## VIII.  CONCLUSION & RECOMMENDATION

2        For the reasons set forth above, the Court **RECOMMENDS** that the

3  Commissioner's decision be **REVERSED** and this matter be **REMANDED** for further

4  administrative proceedings consistent with this Report and Recommendation.

5        Additionally, **IT IS ORDERED** that no later than **August 4, 2023**, any party to

6  this action may file written objections with the Court and serve a copy on all parties.  The

7  document shall be captions "Objections to Report and Recommendation."

8        **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with

9  the Court and served on all parties no later than **August 11, 2023**.  The parties are

10  advised that failure to file objections within the specified time may waive the right to

11  raise these objections on appeal of the Court's order.  See Turner v. Duncan, F.3d 449,

12  455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

13        **IT IS SO ORDERED.**

14  Dated:  July 21, 2023

15

16

17  _____

18  Honorable Lupe Rodriguez, Jr.
    United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28